UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALLIANCE INTERNATIONAL
CHB, INC.,

    Plaintiff,                        Case No.

v.

MADISON MARKEL,

    Defendant.
_____/

**VERIFIED COMPLAINT FOR DAMAGES, TEMPORARY**
**RESTRAINING ORDER, AND INJUNCTIVE RELIEF**

Plaintiff Alliance International CHB, Inc. ("Alliance"), by and through its undersigned counsel, hereby files this *Verified Complaint for Damages, Temporary Restraining Order, and Injunctive Relief*. This action arises out of the theft of Alliance's trade secrets by Defendant and former Alliance employee, Madison Markel ("Markel"). Alliance brings this action under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* ("DTSA"), and the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq.* ("FUTSA").

**NATURE OF THE CASE**

1.    Founded in 2001, Alliance is an industry leader in customs duty drawback program management that manages programs for leading companies across multiple industries. Their services include minimizing

1

compliance risk, reducing administrative burden, and delivering strategic business insights. Alliance also is an industry leader in preparation and submission of duty drawback claims with U.S. Customs and Border Protection ("Customs") that generate millions in compliant tariff refunds for its clients.

2. Alliance provides its services to companies in Florida and nationwide.

3. Markel now works for one of Alliance's direct competitors, as a Senior Onboarding Manager, and this lawsuit seeks to stop an orchestrated effort by Markel to misappropriate Alliance's trade secrets to unfairly compete in this highly competitive market for projects that can generate millions of dollars in revenue.

4. On May 30, 2025, Markel downloaded the files at issue and on June 2, 2025, the very next business day, Markel provided her Notice of Resignation to Alliance.

5. But just before Markel resigned and potentially lost access to Alliance's computing systems and platforms, she downloaded highly valuable trade secrets from a server containing Alliance's confidential and proprietary information.

6. Markel downloaded Alliance's client list, at least six proprietary software macros, and other sensitive files on May 30, 2025, which was the last business day before Markel provided notice of resignation to Alliance and her

2

last day in the office. Markel occupied a level 2 data analyst position and the downloading of Alliance's entire client list was not needed to perform her job.

7. Upon information and belief, including publicly available records, Markel began working for a direct competitor of Alliance in or about February 2026.

8. Because Markel has improperly taken Alliance's trade secrets and (on information and belief) is using that information to compete unfairly, Alliance brings this action.

9. Markel's continued disregard for fair and lawful business practices and her unlawful retention and use of Alliance's trade secrets will allow her to profit unjustly and threatens to damage Alliance.

10. If Markel is not immediately enjoined — and, most critically, required to submit to forensic examinations to purge her computing devices, networks, and accounts of stolen, confidential and proprietary information — Alliance will face the threat of irreparable harm, as she will continue to engage in unlawful competition with impunity.

## PARTIES

11. Plaintiff Alliance is a Utah Corporation authorized to transact business in Florida. Alliance's principal place of business is St. Petersburg, Florida, within the Middle District of Florida.

12. Defendant Markel is a citizen and resident of Florida and who,

upon information and belief, is working remotely in Florida for a Utah company that competes with Alliance in the duty drawback industry.

## JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and § 1367. This case presents a claim arising under the laws of the United States, specifically the DTSA. The remaining state law claim is part of the same case and controversy as the DTSA claim.

14. The Court may exercise personal jurisdiction over Markel because she is a citizen and resident of Florida. Additionally, these causes of action arise specifically out of her contacts with Florida including her employment within the Middle District of Florida.

15. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391, as a substantial part of the events giving rise to these claims occurred in this district.

## FACTUAL BACKGROUND

### *Alliance's Business and Its Trade Secrets*

16. Alliance is a licensed Customs brokerage firm focused on maximizing duty drawback refunds through expert consulting and technology. Alliance provides end-to-end services including duty drawback assessment, program implantation, claims processing, data automation, and regulatory compliance support.

17.     Duty drawback firms act as intermediaries between businesses and U.S. Customs and Border Protection to recover refunds on certain import duties, taxes, and fees. Duty drawback firms utilize advanced, and often proprietary, strategies to maximize refunds for their clients.

18.     Alliance has been in the duty drawback industry for over 25 years while its CEO Anthony Nogueras has been in the drawback industry for over 35 years and both have developed extensive subject matter expertise. Alliance uses its experience and expertise to develop confidential, proprietary software programs and macros and has expended significant time and financial resources in developing these programs and macros.

19.     Alliance also maintains a confidential, proprietary client list that Alliance has grown and cultivated over its decades in the industry. Cultivating client relationships is essential to Alliance's business.

20.     Alliance's client list as well as its proprietary drawback software and macros are commercially valuable and enable Alliance to compete in a highly competitive industry.

21.     To develop and maintain customer and supplier relationships, Alliance invests significant time, money, and energy into researching potential clients, developing marketing strategies, creating financial forecasts and business forecasts, and developing its pricing structures. These efforts, which are dependent on the accumulation, application, and secrecy of Alliance's

confidential business information, are crucial to Alliance's success in the competitive market. For this reason, Alliance's confidential information, identifying clients and pricing information has substantial value to Alliance.

22. Alliance's competitive position largely rests on protecting its confidential business information in this highly competitive field, and Alliance takes reasonable measures to keep its information out of its competitors' hands. The composite of this information, moreover, is not generally known outside of Alliance, and Alliance only entrusts this information with employees who need access to perform their jobs.

23. To protect its information, Alliance requires its employees to sign and agree to employment policies and procedures designed to protect the confidentiality of its information. Alliance, for instance, requires employees to sign and acknowledge receipt and compliance with its employee handbook, which makes clear that:

> During, and after the term of employment, Employee shall keep secret and retain in strict confidence, nor shall divulge or convey to others Alliance's confidential information. Alliance confidential information shall include, but is not limited to, secret, confidential or proprietary matters, of a business nature, including information about business processes, policies and procedures, communications between employee and Alliance in connection with the Alliance's business and clients, marketing and sales tactics, client sales lists, identities of clients, contracts, company financial information pricing policies, or any information contained in documentation received by employee in

connection to the Customs Drawback Services.

**Exhibit 1**, "Section 3.7 Privacy and Confidentiality (2025 Alliance Employee Handbook)," at 3.

24. Markel knows that Alliance takes these measures to safeguard its confidential business information, as Markel agreed in writing to be bound by these obligations. **Exhibit 1** at 3; **Exhibit 2**, "Acknowledgments of Receipt," at 2.

25. Markel signed both an Acknowledgment of Receipt for Employee Handbook and Anti-Corruption/Conflict of Interest Policy & Procedure documents on or about July 10, 2023. *See* **Exhibit 2** at 2, 4. Markel was on notice with respect to Alliance's efforts to keep its trade secrets confidential and agreed to reasonably protect those secrets.

26. Alliance further protects its confidential information on password-protected servers and cloud-based platforms that can only be accessed by select employees who have a valid reason to review or use the information. Alliance also trains its employees, including all new hires, with access to confidential company documents that the documents are confidential and valuable to Alliance and should not be disclosed to anyone outside of Alliance. In the hands of a direct competitor, this information could be damaging to Alliance.

### *Defendant Markel has Misappropriated Alliance's Trade Secrets*

27. Markel provided notice of her resignation to Alliance via a letter

dated June 2, 2025. **Exhibit 3**, Markel Resignation Letter.

28. Unbeknownst to Alliance at the time, on May 30, 2025, Markel accessed and downloaded at least 34 Alliance files. These included numerous files that Markel would not normally be expected to download as part of her employment.

29. Alliance recently learned that Markel was now working for a direct competitor in the duty drawback industry.

30. Due to concerns that Markel may be leveraging trade secrets of Alliance in her new position, Alliance conducted further investigation in or about February 2026 and discovered for the first time that Markel had accessed and downloaded several valuable and confidential files just prior to quitting her job at Alliance.

31. The files accessed included proprietary VBA macros, SQL database queries and scripts, a client contact list, drawback claim data, error dictionary reference files spanning versions V8 through V32, report templates, and operational process documentation which are materials directly applicable to the duty drawback services provided by her new employer.

32. In the ordinary course of employment, there is no legitimate business need for an employee to engage in a large-scale, consecutive download of company information to perform their assigned duties. This is especially so for Markel who had no business reason or need to download these files on her

last day in the office before resigning.

33.     The following chart summarizes the full download data Alliance obtained from Alliance's ShareFile audit log reflecting a series of 34 file downloads by Markel on May 30, 2025:

| Date | ItemName | Activity | User |
|---|---|---|---|
| 05/30/2025 4:56:22 PM | SCRIPT - Update Claim Table ClaimNumbers.sql | Download | Madison Markel |
| 05/30/2025 4:53:44 PM | SCRIPT - Create ClaimNumber Staging Table.sql | Download | Madison Markel |
| 05/30/2025 3:56:08 PM | MACRO - DC Upload Prep - Imports_v5.xlsm | Download | Madison Markel |
| 05/30/2025 3:55:16 PM | MACRO - DC Upload Prep - Exports_v3.xlsm | Download | Madison Markel |
| 05/30/2025 3:31:01 PM | TEMPLATE - Claim Report_v7.xlsx | Download | Madison Markel |
| 05/30/2025 3:30:59 PM | MACRO - Trim Multiple Columns_v1.xlsm | Download | Madison Markel |
| 05/30/2025 3:26:09 PM | ACE CATAIR_Recon_Error_Dictionary_V5_2018-05-22.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:08 PM | Drawback Error Dictionary V28.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:07 PM | Drawback Error Dictionary V25.0.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:05 PM | Drawback Error Dictionary V23.0.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:04 PM | ACE Drawback Error Dictionary V8.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:04 PM | ACE Drawback Error Dictionary V22.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:02 PM | ACE Drawback Error Dictionary V21.0 edit.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:01 PM | ACE Drawback Error Dictionary V18.0.xlsx | Download | Madison Markel |
| 05/30/2025 3:26:00 PM | ACE Drawback Error Dictionary V17.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:59 PM | ACE Drawback Error Dictionary V16.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:56 PM | ACE Drawback Error Dictionary V15.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:55 PM | ACE Drawback Error Dictionary V14.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:54 PM | ACE Drawback Error Dictionary V13.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:53 PM | ACE Drawback Error Dictionary V11.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:52 PM | ACE Drawback Error Dictionary V10.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:23 PM | Drawback Error Dictionary V32.xlsx | Download | Madison Markel |
| 05/30/2025 3:25:22 PM | ACE_CATAIR_Error_Dictionary_V29 (ABXY Record Errors).xlsx | Download | Madison Markel |
| 05/30/2025 3:24:49 PM | TRAINING - ABI & CATAIR/ACE Drawback Error Dictionary V22.xlsx | Download | Madison Markel |
| 05/30/2025 2:20:31 PM | QUERY - Full Claim Report_v2.sql | Download | Madison Markel |
| 05/30/2025 1:59:34 PM | QUERY - UnclaimedExports - Explicit J1_v2.sql | Download | Madison Markel |
| 05/30/2025 12:35:01 PM | QUERY - UnclaimedExports - Unused_v4.sql | Download | Madison Markel |
| 05/30/2025 12:34:47 PM | MACRO - ACE File Prep_v12.xlsm | Download | Madison Markel |
| 05/30/2025 12:34:46 PM | MACRO - Multi-File Compile_v1.xlsm | Download | Madison Markel |
| 05/30/2025 12:19:57 PM | QUERY - Value Scan_v2.sql | Download | Madison Markel |
| 05/30/2025 12:19:49 PM | MACRO - folderCreation.xlsm | Download | Madison Markel |
| 05/30/2025 12:08:39 PM | PROCESS_Alternate Parts.docx | Download | Madison Markel |
| 05/30/2025 11:29:04 AM | ES-601_Drawback_Claim_Details_ForDB.xlsx | Download | Madison Markel |
| 05/30/2025 10:40:36 AM | Client Contact List.xlsx | Download | Madison Markel |

**Exhibit 4**, chart reflecting the May 30, 2025 downloads.

34.     Included among the items Markel misappropriated are Alliance's

9

client list and several "macros" developed by Alliance to use in the duty drawback space. All files were confidential and protected trade secrets of Alliance.

35. All the download events originated from one of Alliance's IP addresses geolocated to St. Petersburg, Florida, at a time when Markel had no legitimate business need for such materials and was actively preparing to depart from Alliance.

36. There can be only one reason that Markel downloaded Alliance's confidential business information just before resigning: she was ensuring that Markel would have access to this information after her employment with Alliance ended. That is, on her last day in the office, she downloaded *only* these proprietary programs and client list. She did not download any files for clients assigned to her.

37. The downloaded files reflected in Exhibit 4 included the following:

1. Macros/Templates: Internally developed programmatic code used to restructure and prepare data for data validation, analysis, and use in drawback claims;

2. Scripts: Internally developed programmatic code used to make changes to underlying data within a database according to our internal policies and procedures;

3. Queries: Internally developed programmatic code used to extract data into specific reports used for enhanced data validations;

4. Drawback Error Dictionary: Internally created troubleshooting guide that saves time and increases processing efficiency in error handling;

     5. Training: Internally developed materials that save time and increase performance; and

     6. ES-601 Drawback Report: Report of every claim Alliance has submitted to Customs, including the claimant and the claim amounts.

38. With respect to file types 1-5 in paragraph 36, each contains programmatic code or other information that has been developed and refined, over the course of years, to improve efficiency and performance, create enhanced data validation techniques that are unique to Alliance, and support deeper data analysis.

39. The ES-601 Drawback Report is highly confidential and proprietary in that it includes data on every claim Alliance has ever submitted to Customs and contains confidential client information.

40. Alliance is aware of messages in which Defendant expressly admitted to deleting information relevant to ongoing client matters and refusing to update notes within the client files. Defendant further acknowledged that these actions were undertaken for the purpose of making the transition to a newly assigned drawback specialist more difficult.

41. Defendant also discussed her new employment with Alliance's competitor in a recent message, in or around February 2026, where Markel stated:

> They [Alliance's Competitor] primarily file 1313a (WEIRD!!! And crazy), and are terrified of J2, so they don't file it at all or understand it really right now. Eager to get started building that out for them!

42. This communication demonstrates that Markel appears to be replicating Alliance's established processing procedures for her new employer and the downloaded files Markel stole from Alliance would greatly aid in that endeavor.

43. "J2" is a reference to 19 U.S.C. § 1313(j)(2). The industry acronym is J2. Two of the macros stolen by Markel allow her to easily convert Customs data to prepare claims for filing. This would give her and her employer a competitive advantage by exploiting technical proficiency Alliance took years to accumulate.

44. Alliance did not authorize Markel to retain, disclose, or use the files after separation.

45. As "Senior Onboarding Manager," Markel's new role at an Alliance competitor likely involves setting up new client drawback programs-precisely the function where Alliance's proprietary tools, process documentation, and client relationships would provide the greatest competitive advantage.

46. An analysis of Markel's downloading activity, as recorded in both the ShareFile audit log and corroborated by endpoint artifacts found on her reprovisioned corporate workstation, indicated that Markel was likely engaged in pre-departure planning by downloading 34 files on her last day in the office, often in one second interval download clusters, spanning Alliance's operations: macros, queries, scripts, client contacts, claim data, error dictionaries, templates, and process documentation.

47. The one second interval download clusters are observable not only in the error dictionary folder (15 files, 3:24–3:27 PM) but also in the macro and SQL query access clusters, suggesting multiple folder-level copy operations were performed throughout the day, each targeting a different category of proprietary files.

48. The 34 files recorded in the ShareFile audit log were not recovered from Markel's user profile or the ShareFile local cache directory. The combination of the folder-copy access patterns and absent local files supports the conclusion that the files were copied to an external device and deleted from the workstation.

49. Further download activity took place on the evening of June 1, 2025—*a Sunday night*—during which time Markel accessed SharePoint personal documents and OneNote backup which demonstrates a separate episode of personal data retrieval the night before resigning separate and apart from the May 30th download activity.

50. Markel must be enjoined from retaining, using, and disclosing the misappropriated information, and must submit, at a minimum, to a <u>thorough computer forensic examination</u> to ensure that Alliance's information is permanently removed from Markel's computing devices, network, platforms, and any other back-up platforms/accounts (such as iCloud, AWS, dropbox, GoogleDrive, OneDrive, etc.).

## CAUSES OF ACTION

### COUNT 1
### *Violation of the Defend Trade Secrets Act*

51. Alliance repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

52. The DTSA defines a trade secret as, *inter alia,* "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not use the trade secret.

53. Alliance's trade secrets, including its client lists and contact information, customer pricing information, financial information, business and project forecasts, and other information, were kept secret by reasonable measures undertaken by Alliance to protect the secret and private nature of the information.

54. Alliance's trade secrets are related to products and services offered in interstate commerce.

55. Markel had access to this confidential business information in the performance of her job duties on behalf of Alliance.

56. As detailed above, in the days before she resigned, Markel

surreptitiously and improperly downloaded these trade secrets and, upon information and belief, is unlawfully using these trade secrets to benefit herself and her new employer.

57. The categories of misappropriated Alliance information include, for example, client and contact lists, software and macros, and project information. In other words, through Markel, a direct competitor has access to Alliance's playbook.

58. As a direct result of Markel's misappropriation, Alliance has been harmed and continues to be irreparably harmed.

## COUNT 2
### *Violation of the Florida Uniform Trade Secrets Act*

59. Alliance repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

60. The FUTSA, Fla. Stat. § 688.002 defines a trade secret as, "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

61. Alliance's trade secrets, including its client and contact lists, software and macros, and project information, were kept secret by reasonable

measures undertaken by Alliance to protect the secret and private nature of the information.

62. Markel was entrusted with this confidential business information in the performance of her job duties on behalf of Alliance.

63. As detailed above, in the days before she resigned, Markel surreptitiously and improperly downloaded these trade secrets and, upon information and belief, is unlawfully using these trade secrets to benefit herself and her new employer.

64. The categories of misappropriated Alliance information include, for example, client and contact lists, software and macros, and project information. In other words, through Markel, a direct competitor has access to Alliance's playbook.

65. As a direct result of Markel's misappropriation, Alliance has been harmed and continues to be irreparably harmed.

## COUNT 3
### *Injunctive Relief under the DTSA and FUTSA*

66. Alliance repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

67. As a direct and proximate result of Markel's misappropriation of Alliance's trade secrets, Alliance faces the threat of irreparable harm in the form of disclosure and use of its trade secrets. Moreover, the misappropriation continues to afford Markel, who works for a direct competitor of Alliance, an

unfair and illegal advantage in gaining business to Alliance's detriment.

68. Alliance has no adequate remedy at law to stop the irreparable harm. Should her actions continue unabated, Alliance will lose the value of its investment in the trade secrets that were misappropriated, as well as potential customer relationships (and goodwill that accompanies them) and market share it took Alliance many years to build, thereby threatening to irreparably affect Alliance's legally obtained competitive advantages.

69. Markel will suffer no inconvenience from the issuance of injunctive relief based on the actual and/or threatened disclosure of Alliance's trade secrets, and the use of those trade secrets, as provided for under both the DTSA, 18 U.S.C. § 1836(b)(3)(A) and the FUTSA, Fla. Stat. § 688.003.

70. Additionally, Markel's actions in misappropriating Alliance's trade secrets justify the expectation that she will continue to violate the DTSA and FUTSA without immediate action in the issuance of injunctive relief.

71. The balance of the equities in this case clearly weigh in favor of granting injunctive relief, as does the public interest in preventing unfair competition or the disclosure of Alliance's trade secret information.

## **JURY DEMAND**

72. Alliance demands a trial by jury.

## **PRAYER FOR RELIEF**

For these reasons, Alliance respectfully requests that the Court enter judgment against Defendant Madison Markel awarding money damages and all other relief to which Alliance is entitled to in contract, law, and equity, including but not limited to:

1. Judgment in favor of Alliance and against the Defendant on Count One, awarding damages to Alliance for the Defendant's violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*;

2. Judgment in favor of Alliance and against the Defendant on Count Two, awarding damages to Alliance for the Defendant's violation of the Florida Uniform Trade Secrets Act, Fla. Stat.§ 688.001 *et seq.*;

3. Entry of a temporary restraining order prohibiting Defendant, and/or any person or entity acting in concert with them, from retaining, using, disclosing, or disseminating Alliance's trade secrets, and requiring forensic examinations of the computers, devices, accounts, and platforms used by Markel;

4. After due proceedings conclude, entry of a preliminary injunction prohibiting Defendant, and/or any person or entity acting in concert with them, from retaining, using, disclosing, or disseminating Alliance's trade secrets; and

5. After due proceedings conclude, entry of a permanent injunction, an award of damages based on all the claims stated herein (actual, compensatory, exemplary, and punitive), and other such damages as provided by applicable statute, common law, or the Agreement (or any other agreement) between the parties, including attorneys' fees, expert fees, and costs. The permanent injunction shall prohibit Defendant, and/or any person or entity acting in concert with them, from retaining, using, disclosing, or disseminating Alliance's trade secrets.

Respectfully submitted:

**s/ Matthew J. Mueller**
Matthew J. Mueller, FBN: 0047366
Email matt@fmhlegal.com
FOGARTY MUELLER HARRIS, PLLC
501 E. Kennedy Blvd.
Suite 1030
Tampa, Florida 33602
Telephone: (813) 682-1730
*Facsimile: (813) 682-1731*

***Counsel for Alliance International CHB, Inc.***

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALLIANCE INTERNATIONAL
CHB, INC.,

    Plaintiff,

v.

MADISON MARKEL,

    Defendant.
_____/

Case No.

## VERIFICATION

I, Anthony Nogueras, pursuant to 28 U.S.C. § 1746, swear under penalty of perjury, that I am the CEO for Alliance International CHB, Inc., that I have read the allegations in the Verified Complaint for Damages, Temporary Restraining Order, and Injunctive Relief, and that the factual allegations set forth in paragraphs 1-10 and 16-50 are true and correct to the best of my knowledge, information, and belief.

Dated: March 2, 2026

_____
Anthony Nogueras

1